## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ) | |
| UNITED STATES OF AMERICA ) | **CRIMINAL NO. 99-10044-REK** |
| ) | |
| v.                                ) | **VIOLATIONS:** |
| ) | |
| ) | **18 U.S.C. § 371** |
| 1.  K. GLENN SHAW          ) | **(Conspiracy to Defraud)** |
| 2.  EILEEN B. AIRD          ) | |
| ) | **18 U.S.C. § 371** |
| ) | **(Conspiracy to Commit Offense)** |
| Defendants  ) | |
| ) | |

## SECOND SUPERSEDING INDICTMENT

1

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times material hereto, unless otherwise alleged:

### A.     THE DEFENDANTS

1.     From in or about 1989 through in or about December 3, 1993, the defendant, **K. GLENN SHAW,** was President of National Medical Care Medical Products Division, Inc. ("MPD"), formerly known as Erika, Inc., and subsequently known as NMC Medical Products, Inc., which was a wholly owned subsidiary of National Medical Care, Inc. ("NMC").

2.     From in or about August, 1990 through in or about December, 1992, **EILEEN B. AIRD** was General Manager of LIFECHEM, INC. ("Lifechem"), which was an indirect wholly owned subsidiary of NMC. **AIRD** was President of LifeChem from in or about January, 1993 through in or about October, 1996, when she became Vice President, Fresenius Medical Care – North America – Special Liason, until in or about April, 1997.

### B.     THE BUSINESS

3.     NMC was a for-profit corporation with a principal place of business in Waltham, Massachusetts from at least 1989 through on or about October 1, 1996. One of NMC's wholly owned subsidiaries was MPD, a corporation with a principal place of business in Rockleigh, New Jersey. One of NMC's indirect wholly owned subsidiaries was LifeChem, a corporation with a principal place of business in Northvale, New Jersey until in or about October, 1995, when it moved to Rockleigh, New Jersey. On or about October 1, 1996, NMC and its subsidiaries were purchased by Fresenius Medical Care A.G., a German corporation, which continued to operate NMC's business through its American subsidiary, Fresenius Medical Care Holdings, Inc., doing business as Fresenius

2

Medical Care -- North America.

4.      NMC was engaged in the business of selling products and services associated with the

medical care and treatment to patients diagnosed with End Stage Renal Disease ("ESRD").  ESRD

was a disease which affects an individual's kidneys and, among other things, inhibited their regular

cleansing of the body's blood.  One treatment for persons suffering from ESRD was the process of

kidney dialysis.  Briefly stated, dialysis involved the removal of impurities from an individual's blood

by the diversion of the blood from the body through a dialysis machine which cleansed the blood and

then returned the blood back to the body.  The average patient required dialysis of his or her blood

at least three times each week for the remainder of the patient's life or until receipt of a successful

kidney transplant.

5.      NMC owned and operated hundreds of outpatient clinics around the country which

provided dialysis treatments to ESRD patients through one of its divisions, the Dialysis Services

Division.  These NMC owned dialysis clinics were operated under the name Bio-Medical Applications

or "BMA," and were known with NMC as the "BMA's."

6.      MPD was a subsidiary of NMC that was engaged in the business of manufacturing,

purchasing, distributing, and selling products used in the dialysis treatments provided to ESRD

patients.  MPD sold dialysis related products both to dialysis facilities owned by NMC ("the BMAs")

and to dialysis facilities not owned by NMC (the "external clinics").  Some of the products sold and

distributed by MPD included artificial kidneys, blood lines, concentrate, and fistula needles used in

dialysis treatments.

7.      LifeChem was a subsidiary of MPD that was engaged in the business of selling clinical

laboratory blood testing services to both the BMAs and external dialysis clinics.  LifeChem

3

specialized in performing laboratory blood tests for ESRD patients. LifeChem owned and operated two clinical laboratories, one located in Northvale, and later Rockleigh, New Jersey, and the other in Woodland Hills, California. BMAs were encouraged to use LifeChem for blood laboratory testing with the exception of certain emergency tests and specialty tests. LifeChem sold its laboratory services to external dialysis clinics as well.

8.    MPD employed a sales force of Dialysis Services Specialists, who were assigned a designated geographic territory and sold both the dialysis products of MPD and the blood testing services of Lifechem. These salespersons sold products and LifeChem services to both BMAs and external facilities within their territory and were compensated on the basis of a base salary plus commission.

## C.    THE MEDICARE PROGRAM

9.    In 1965, Congress enacted Title XVIII of the Social Security Act ("Medicare" or the "Medicare Program") authorizing the federal government to pay for the cost of certain medical services and care, including clinical laboratory blood testing services, for persons aged 65 and older, and for persons with disabilities. The monies set aside by Congress to pay for the necessary medical care of these elderly or disabled Americans, as well as any premiums paid by such persons, are referred to throughout this Second Superseding Indictment as the Medicare Program Trust Funds.

10.    On or about October 1, 1972, Congress extended the coverage of the Medicare Program to include paying, under most conditions, for the cost of certain medical services and care for persons suffering from ESRD, regardless of the person's age.

11.    The Department of Health and Human Services was an agency of the United States and was responsible for the funding, administration and supervision of the Medicare Program. The

4

Health Care Financing Administration ("HCFA") was a division of that agency of the United States and was directly responsible for the administration of the Medicare Program. HCFA, in discharging those responsibilities, contracted with private insurance companies, known as "carriers," to receive, review, and pay appropriate claims for reimbursement for the provision of clinical laboratory services to Medicare Program beneficiaries.

12.    LifeChem was an approved provider under Title XVIII of the Social Security Act of 1965. As an approved provider, LifeChem was authorized to submit directly to the carriers under contract with HCFA lawful claims for reimbursement for clinical laboratory blood tests that were ordered by physicians and that were reasonable and medically necessary in the diagnosis and treatment of Medicare Program beneficiaries.

13.    At all times pertinent herein, LifeChem submitted its claims for Medicare reimbursement directly to Pennsylvania Blue Shield, and later to Xact Medicare Services, both located in Camp Hill, Pennsylvania. Pennsylvania Blue Shield and Xact Medicare Services were carriers under contract with HCFA.

### D.    END STAGE RENAL DISEASE BLOOD TESTING

14.    The care and treatment of an ESRD patient through the process of dialysis included the regular monitoring of the individual's blood through clinical laboratory blood testing. These regular blood tests were referred to by the Medicare program as Routine Tests. Persons suffering from ESRD could also suffer from additional medical problems and complications which required medical treatment beyond the process of dialysis. For such patients, additional monitoring of the blood may have been medically necessary, and these additional blood tests were referred to by the Medicare program as Non-Routine Tests.

15.    Medicare established a composite rate payment to the dialysis facility providing the dialysis treatments to ESRD patients which included an amount for the costs associated with the Routine Tests.   Routine Tests were not separately billable by a clinical laboratory to Medicare. Medicare paid the dialysis facility for the Routine Tests through the composite rate payment, and it was the responsibility of the dialysis facility to pay the clinical laboratory for performing the Routine Tests.   The composite rate payment for dialysis treatment did not include payment for any Non-Routine Tests.   A clinical laboratory, such as LifeChem, directly billed the Medicare program and the Medicare program separately paid the clinical laboratory for Non-Routine Tests on a fee-for-service basis with funds from the Medicare Program Trust Funds.

16.    The Non-Routine Tests were lawfully reimbursable by the Medicare Program only when they were reasonable and medically necessary for the diagnosis or treatment of signs or symptoms of illness or injury in ESRD patients *other* than ESRD, except for certain specified Non-Routine Tests enumerated by HCFA that were allowed and paid for by the Medicare Program at specified frequencies for ESRD patients ("Medicare Allowable Tests").   As the defendants **EILEEN B. AIRD** and **K. GLENN SHAW** knew, LifeChem obtained the substantial majority of its total revenues from payments by the Medicare Program for Non-Routine Tests performed for dialysis patients.

17.    To obtain reimbursement for Non-Routine Tests provided to ESRD patients, LifeChem was required to certify to HCFA, through its Medicare carrier, that the tests were medically necessary.   As the defendant **EILEEN B. AIRD** knew, Medicare paid for Non-Routine Tests, other than Medicare Allowable Tests, only if the tests were medically necessary for diagnosis or treatment of an ESRD patient's medical condition other than ESRD.

6

## HEPATITIS PANELS AND HEPATITIS C TESTS

18.    From in or about 1986, Lifechem offered for sale to dialysis physicians, and received reimbursement from Medicare for, a group of tests that LifeChem called a Hepatitis Panel that consisted of tests related to the hepatitis B virus. LifeChem also offered the hepatitis B related tests separately to physicians.

19.    In about 1990, a new laboratory blood test was developed for detection of an antibody to the hepatitis C virus, also known as the Hepatitis C antibody test ("Hepatitis C test"). Medicare paid for a Hepatitis C test so long as the test was ordered by a physician who considered the test medically necessary for the treatment or diagnosis of the patient's condition other than ESRD. As the defendant **EILEEN B. AIRD** knew, few physicians ordered Hepatitis C tests from LifeChem in 1990 and in early 1991.

20.    The defendant **EILEEN B. AIRD** further knew that Medicare did not pay for Hepatitis C tests which were not medically necessary for the treatment or diagnosis of a patient's medical condition other than ESRD, and she was informed and believed that repeat Hepatitis C testing for ESRD patients who were positive for the Hepatitis C antibody was not medically necessary, and that more than quarterly Hepatitis C testing for ESRD patients who were negative for the antibody was not medically necessary.

**COUNT ONE**          **(18 U.S.C. § 371 – Conspiracy to Defraud)**

21.    The allegations set forth in paragraphs one through twenty of this Second Superseding Indictment are hereby incorporated in full.

22.    From in or about August, 1991 through in or about 1997, the exact dates being unknown to the grand jury, in Waltham and elsewhere in the District of Massachusetts, in Northvale and Rockleigh, New Jersey, and elsewhere in the United States, the defendant

**EILEEN B. AIRD**

together with others known and unknown to the Grand Jury, did knowingly, intentionally and willfully combine, conspire, confederate and agree to defraud the United States, and its agency, the Health Care Financing Administration, in its administration of the Medicare program, by engaging in deceit, craft and trickery in dealing with physicians, dialysis center staff, and others, in order to cause physicians to unwittingly order laboratory blood tests from LifeChem that the defendant and her co-conspirators believed were not medically necessary for the treatment or diagnosis of dialysis patients; and thereby to enable LifeChem to unlawfully receive reimbursement from the Medicare Program for laboratory tests performed on the blood drawn from these dialysis patients, all for the purpose of evading and frustrating efforts by the Medicare Program to pay only for medically necessary clinical laboratory blood testing on Medicare Program beneficiaries.

**OBJECTIVE OF THE CONSPIRACY**

23.    The purpose of the conspiracy was to evade and frustrate efforts by Medicare to pay only for the reasonable and medically necessary blood testing of Medicare Program beneficiaries as knowingly ordered by physicians in the normal and ordinary course of the treatment of their dialysis patients; and thereby to fraudulently obtain reimbursement from the Medicare Program for thousands

8

of laboratory tests on blood drawn from dialysis patients that the defendant and her co-conspirators believed were not medically necessary, and therefore understood were not lawfully reimbursable. A further objective of the conspiracy was to deliberately manipulate the ordering patterns of laboratory blood tests by physicians. That deliberate manipulation of the ordering patterns of blood tests, orchestrated to unlawfully obtain money from the Medicare program, resulted in the receipt by LifeChem of thousands of orders for blood tests that the defendant and her co-conspirators believed were not medically necessary, and enabled LifeChem to directly bill the Medicare Program for blood tests that the defendant **EILEEN B. AIRD** and her co-conspirators understood were not lawfully reimbursable by the Medicare Program. The defendant and her co-conspirators' success in deliberately manipulating the ordering patterns of physicians caused LifeChem to receive monies from Medicare to which the defendant **EILEEN B. AIRD** and her co-conspirators believed LifeChem was not entitled.

## MANNER AND MEANS OF THE CONSPIRACY

24.    It was part of the manner and means of the conspiracy that the defendant **EILEEN B. AIRD**, together with others known and unknown to the Grand Jury:

a.    bundled a Hepatitis C test with LifeChem's Hepatitis Panel, so that each time a doctor ordered a Hepatitis Panel, a Hepatitis C test was performed for the same patient, without regard to whether the test was medically necessary in the treatment or diagnosis of the patient's medical condition and without regard to whether the physician intended to order the additional test;

b.    marketed and promoted the monthly ordering of LifeChem's Hepatitis Panel on all ESRD patients, so that each time the doctor ordered a Hepatitis Panel, the Hepatitis C test was performed for each patient in certain dialysis facilities without regard to whether the additional test

9

was medically necessary in the treatment and diagnosis of the patient's condition and without regard to whether the physician intended to order the bundled Hepatitis C test each time the panel was ordered;

      c.     supplied to physicians LifeChem's paper requisition or laboratory test order forms which made it difficult for a physician to order LifeChem's Hepatitis Panel without the bundled Hepatitis C test, and which made it difficult for physicians to understand what Hepatitis tests were included on LifeChem's Hepatitis Panel;

      d.     attempted to mislead physicians and dialysis center staff by falsely suggesting to them that ordering LifeChem's laboratory blood tests in a panel or profile was cheaper or more economical than selectively ordering individual blood tests, and by failing to disclose to physicians that LifeChem was, in fact, charging the Medicare Program for each of the bundled Hepatitis C tests at the Medicare fee schedule rate, such failure to disclose being a part of the plan to cause physicians to order Hepatitis C tests that defendant and her co-conspirators believed were not medically necessary;

      e.     provided incentives in the form of commissions to MPD's sales force to encourage and promote the sale to the BMAs of LifeChem's Hepatitis Panels without regard to whether the bundled Hepatitis C tests were medically necessary in the diagnosis or treatment of the patients' conditions other than ESRD;

      f.     supplied to physicians a computer and computerized test ordering software which encouraged physicians to order LifeChem's Hepatitis Panel rather than individual tests, which made it difficult to order LifeChem's Hepatitis Panel without the bundled Hepatitis C test; and which made it difficult for physicians to understand what tests were included on Lifechem's Hepatitis Panel;

g.      utilized the MPD sales force to install the computerized ordering system in the BMAs, and submitted or caused to be submitted claims for payment to Medicare for increased orders for LifeChem's Hepatitis Panels, including the bundled Hepatitis C test, particularly in the Southeast sales region, without regard to whether the additional tests were medically necessary in the diagnosis or treatment of the ESRD patients' medical condition other than ESRD;

h.      attempted to mislead physicians by suggesting to them that NMC or BMA medical policy required or encouraged performance of LifeChem Hepatitis Panels, including Hepatitis C tests, when, to the contrary, the Clinical Services Division at NMC, the division with oversight over BMA medical policies, recommended against the routine use of LifeChem's Hepatitis Panels and against routine use of Hepatitis C tests;

i.      obtained diagnosis codes, known as ICD-9 codes, for Hepatitis Panels to enable LifeChem to provide medical justification to the Medicare carrier for the Non-Routine Tests, without disclosing to the Medicare carrier that the Hepatitis C test had been added to the Hepatitis Panel by LifeChem and that physicians had rarely ordered Hepatitis C tests separately prior to the LifeChem's addition of the Hepatitis C test to the Hepatitis Panel;

j.      billed the Medicare program for the bundled Hepatitis C test in the Hepatitis Panel on a monthly basis for all patients in certain dialysis facilities, including for those patients who were repeatedly positive for the Hepatitis C, all the while believing that all of the Hepatitis C tests were not medically necessary and concealing that information from the Medicare Program and HCFA; and

k.      collected from the Medicare program about $19.00, more or less, for each bundled Hepatitis C test.

11

## OVERT ACTS

25.    In furtherance of the conspiracy, the defendant **EILEEN B. AIRD**, together with others known and unknown to the grand jury committed, among other acts, the following overt acts in the District of Massachusetts and elsewhere:

a.    In or about May, 1991, the defendant **EILEEN B. AIRD** and her co-conspirators initiated a Profit Recovery Program to offset revenue losses from government regulatory actions in connection with the manufacturing of certain MPD dialysis products, all in attempt to meet budget goals, by adding the Hepatitis C test to LifeChem's Hepatitis Panel, and by marketing, promoting and causing the substitution of monthly Hepatitis Panels for individual Hepatitis test ordering at the BMAs (the "Hepatitis plan").

b.    In or about May, 1991, with **EILEEN B. AIRD's** rejected a recommendation by the LifeChem Product Manager to provide LifeChem customers two Hepatitis Panels, one with the added Hepatitis C test and one without, in order to provide physicians a choice, and further instructed the LifeChem Product Manager that Hepatitis Panels would be promoted on a monthly rather than quarterly basis for all BMAs;

c.    In or about June 1991, **EILEEN B. AIRD** obtained approval from the President of NMC, in Waltham, Massachusetts, and the President and the Vice President of Finance of MPD, in Rockleigh, New Jersey, among others, to purchase equipment to enable the laboratory to perform additional Hepatitis testing anticipated to result from the Hepatitis plan, which, **EILEEN B. AIRD** informed her superiors, included an estimated additional 55,000 Hepatitis C tests that she expected to result from the implementation of the Hepatitis plan in the first year alone.

d.      In or about June, 1991, to justify approval to purchase the laboratory equipment needed to perform the additional Hepatitis tests, **EILEEN B. AIRD** informed the President of NMC, in Waltham, Massachusetts, and the President and Vice President of Finance of MPD, in Rockleigh, New Jersey, among others, that LifeChem projected an increase in 1991 revenue by $524,000 and profit from operations ("PFO") by $308,000 if the Hepatitis C test could be added to the Hepatitis Panel by July 1, 1991, with a five year projected revenue stream of over $6,000,000 and PFO of over $3,300,000.

e.      In or about June, 1991, at **EILEEN B. AIRD's** direction, the LifeChem Product Manager notified the MPD sales force about the decision to add a Hepatitis C test to the Hepatitis Panel and to market monthly LifeChem's Hepatitis Panels with the bundled Hepatitis C test to customers as a replacement for individual test ordering in the BMAs.

f.      On or about July 31, 1991, with **EILEEN B. AIRD's** approval, the LifeChem Product Manager announced the addition of the Hepatitis C test to the LifeChem Hepatitis Panel, without obtaining separate orders from physicians for the added test and without providing customers an option to obtain the Hepatitis Panel without the bundled Hepatitis C test.

g.      In or about September, 1991, **EILEEN B. AIRD** directed that no separate panel would be offered to provide doctors the choice of ordering LifeChem's Hepatitis Panel without the Hepatitis C test, despite complaints about the lack of choice from physicians and the MPD sales force, and despite requests from physicians to delete the bundled Hepatitis C test.

h.      In or about January 1992, after an important customer of LifeChem threatened to withdraw its entire laboratory business if the Hepatitis C test was not deleted from the Hepatitis Panel, LifeChem created a special panel without the Hepatitis C test for that particular customer only.

13

i.    LifeChem supplied to dialysis clinics preprinted paper requisition forms that, from August, 1991 through February 1993, did not list the contents of the Hepatitis Panel on the front of the form, and until July, 1993, did not offer physicians an option of ordering LifeChem's Hepatitis Panel without the Hepatitis C test.

j.    In or about June, 1992, at **EILEEN B. AIRD's** direction, the LifeChem Product Manager announced a new commission program designed to increase sales of LifeChem's Hepatitis Panel by paying each sales representative $3.00 for each additional Hepatitis Panel sold with the Hepatitis C test, and $2.00 per panel for every Hepatitis Panel sold without the Hepatitis C test at the BMAs.

k.    In or about August, 1992, **EILEEN B. AIRD** sought and received approval from the President of NMC, in Waltham, Massacshusetts, and the President and the Vice President of Finance of MPD, in Rockleigh, New Jersey, and others, to purchase equipment for the laboratory to perform the anticipated additional Hepatitis tests expected to result from the commission program, and she informed them that the projected increase in 1992 revenues would be $763,000 with PFO by $465,000 as a result of the additional testing to be performed by LifeChem.

l.    From in or about 1991 through 1994, certain members of the MPD sales force falsely informed physicians and others that ordering LifeChem's Hepatitis Panel was the standard of care or NMC policy at the BMA's, falsely informed physicians and others that ordering the tests in the Lifechem Hepatitis Panel was more economical than ordering tests separately as needed for individual patients, and failed to provide material information to physicians and others regarding the cost to Medicare for the bundled Hepatitis C test on the Hepatitis Panel.

m.    From in or about January, 1993 through June, 1994, LifeChem purchased and installed a computerized laboratory test ordering system in both BMA and non-BMA dialysis clinics, which system included software which did not include on the computerized ordering screen the contents of the Hepatitis Panel, and which made it difficult to order the Hepatitis Panel without the added Hepatitis C test.

n.    From in or about January, 1993 through June, 1994, LifeChem directed the sales force of MPD, and others, to install the computers and to instruct employees of the dialysis facilities how to set up standing orders, and how to use an "assign all" function or "standing order" function on the LifeChem computerized ordering system, which ordered the test for all patients or a designated group of patients in a dialysis facility, and assigned for billing purposes and inserted into the computer the same ICD-9 code as a medical justification for a particular laboratory blood test for each and every patient, or group of patients, at a given facility, regardless of each individual patient's medical condition.

o.    From in or about March, 1994 through June, 1994, LifeChem utilized the MPD sales force to install LifeChem's computerized ordering system at the BMAs, despite the potential for abuse by a sales force whose commissions were directly tied to the amount of increased testing, and which resulted in significant increased testing, including increased orders for Hepatitis Panels.

p.    From in or about August, 1991 through 1997, the defendant **EILEEN B. AIRD** and her co-conspirators submitted claims for payment to the Medicare Program for thousands of Hepatitis C tests that they believed were not medically necessary for the diagnosis or treatment of a Medicare Program beneficiary, and without disclosing that information to the Medicare Program,

15

HCFA, or any carriers employed by the Medicare Program for the processing and payment of claims.

By this conduct, the defendant **EILEEN B. AIRD** and her co-conspirators obtained reimbursements

from Medicare to which the defendant **EILEEN B. AIRD** and her co-conspirators believed LifeChem

was not entitled. Among many other monthly Hepatitis C tests for ESRD patients previously

confirmed positive for the Hepatitis C antibody that **EILEEN B. AIRD** and her co-conspirators

caused to be billed to the Medicare Program were the following tests, conducted on or about the

dates set forth below, and billed to the Medicare Program on or about the dates set forth below:

| Patient Code Letter | Date of Service | Date Claim Submitted |
|---|---|---|
| Patient A | 8/15/94 | 8/23/94 |
| Patient A | 9/19/94 | 9/27/94 |
| Patient A | 10/17/94 | 10/24/94 |
| Patient A | 11/14/94 | 11/22/94 |
| Patient A | 1/2/95 | 1/17/95 |
| Patient A | 2/6/95 | 2/16/95 |
| Patient A | 3/6/95 | 3/14/95 |
| Patient A | 4/3/95 | 4/20/95 |
| Patient A | 5/1/95 | 5/8/95 |
| Patient B | 10/16/91 | 11/1/91 |
| Patient B | 11/13/91 | 12/2/91 |
| Patient B | 2/12/92 | 2/19/92 |
| Patient B | 3/11/92 | 3/28/92 |
| Patient B | 4/15/92 | 4/29/92 |
| Patient B | 5/13/92 | 7/3/92 |
| Patient B | 6/16/92 | 7/9/92 |
| Patient B | 7/15/92 | 7/25/92 |

| | | |
|---|---|---|
| Patient B | 8/12/92 | 8/19/92 |
| Patient B | 9/15/92 | 9/29/92 |
| Patient B | 10/14/92 | 10/24/92 |
| Patient B | 11/11/92 | 11/25/92 |
| Patient B | 12/16/92 | 12/23/92 |
| Patient B | 1/13/93 | 1/25/93 |
| Patient B | 3/10/93 | 3/18/93 |
| Patient B | 4/14/93 | 4/22/93 |
| Patient B | 5/14/93 | 5/24/93 |
| Patient B | 6/16/93 | 6/22/93 |
| Patient B | 7/14/93 | 7/23/93 |
| Patient C | 8/1/94 | 8/8/94 |
| Patient C | 9/12/94 | 9/22/94 |
| Patient C | 10/3/94 | 10/10/94 |
| Patient C | 11/7/94 | 11/14/94 |
| Patient C | 12/5/94 | 12/19/94 |
| Patient C | 1/9/95 | 1/19/95 |
| Patient C | 2/6/95 | 2/16/95 |
| Patient C | 3/6/95 | 3/16/96 |
| Patient D | 8/4/94 | 8/15/94 |
| Patient D | 9/8/94 | 9/19/94 |
| Patient D | 10/6/94 | 10/12/94 |
| Patient D | 11/3/94 | 11/10/94 |
| Patient D | 12/8/94 | 12/19/94 |
| Patient D | 1/5/95 | 1/17/95 |
| Patient D | 2/2/95 | 2/14/95 |

| Patient D | 3/2/95 | 3/9/95 |
|---|---|---|
| Patient D | 4/7/95 | 4/21/95 |
| Patient D | 5/4/95 | 5/11/95 |
| Patient D | 6/8/95 | 6/15/95 |
| Patient D | 7/6/95 | 7/14/95 |
| Patient D | 8/3/95 | 8/8/95 |
| Patient E | 8/8/94 | 8/15/94 |
| Patient E | 9/13/94 | 9/20/94 |
| Patient E | 11/14/94 | 11/21/94 |
| Patient E | 12/12/94 | 12/19/94 |
| Patient E | 1/9/95 | 1/24/95 |
| Patient E | 2/13/95 | 2/28/95 |
| Patient E | 3/13/95 | 3/23/95 |
| Patient E | 4/10/95 | 4/21/95 |
| Patient E | 5/8/95 | 5/15/95 |
| Patient E | 7/17/95 | 7/25/95 |
| Patient E | 8/21/95 | 8/29/95 |
| Patient F | 2/8/95 | 2/27/95 |
| Patient F | 4/6/95 | 4/20/95 |
| Patient F | 5/3/95 | 5/11/95 |
| Patient F | 6/7/95 | 6/15/95 |
| Patient F | 7/5/95 | 7/14/95 |
| Patient F | 8/9/95 | 8/17/95 |
| Patient F | 9/6/95 | 9/12/95 |
| Patient G | 11/4/91 | 11/15/91 |
| Patient G | 1/6/92 | 2/19/92 |

| Patient G | 3/9/92 | 3/19/92 |
| Patient G | 4/6/92 | 4/29/92 |
| Patient G | 5/11/92 | 6/5/92 |
| Patient G | 7/14/92 | 7/22/92 |
| Patient G | 8/11/92 | 8/19/92 |
| Patient G | 9/8/92 | 9/16/92 |
| Patient G | 10/12/92 | 10/23/92 |
| Patient G | 11/9/92 | 12/2/92 |
| Patient G | 12/7/92 | 12/29/92 |
| Patient G | 1/8/93 | 1/19/93 |
| Patient G | 2/9/93 | 2/19/93 |
| Patient G | 3/16/93 | 3/18/93 |
| Patient G | 4/13/93 | 4/20/93 |
| Patient G | 5/10/93 | 5/27/93 |
| Patient G | 6/15/93 | 6/28/93 |
| Patient H | 10/23/91 | 10/31/91 |
| Patient H | 11/15/91 | 11/22/91 |
| Patient H | 2/11/92 | 2/19/92 |
| Patient H | 3/10/92 | 3/18/92 |
| Patient H | 4/14/92 | 4/29/92 |
| Patient H | 5/19/92 | 5/19/92 |
| Patient H | 6/9/92 | 7/9/92 |
| Patient H | 7/14/92 | 7/22/92 |
| Patient H | 8/11/92 | 9/16/92 |
| Patient H | 9/8/92 | 9/23/92 |
| Patient H | 10/13/92 | 10/23/92 |

| Patient H | 11/24/92 | 12/2/92 |
|-----------|----------|---------|
| Patient H | 12/15/92 | 12/18/92 |
| Patient H | 1/12/93 | 1/19/93 |
| Patient H | 2/9/93 | 2/19/93 |
| Patient H | 4/13/93 | 4/20/93 |
| Patient H | 5/18/93 | 5/19/93 |
| Patient H | 6/15/93 | 6/22/93 |
| Patient H | 7/13/93 | 7/23/93 |
| Patient H | 8/3/93 | 8/23/93 |
| Patient H | 9/7/93 | 9/20/93 |

All in violation of Title 18, United States Code, Section 371.

**COUNT TWO:**          **(18 U.S.C. § 371 – Conspiracy to Commit an Offense)**

26.    Paragraphs 1 through 17 of this Second Superseding Indictment are realleged as if fully set forth herein and incorporated in full.

27.    From in or about May, 1987 through in or about July, 1996, in the Districts of Massachusetts, Florida, and New Jersey, and elsewhere across the United States, the defendant

### K. GLENN SHAW

together with others known and unknown to the Grand Jury, knowingly, willfully, and intentionally combined, conspired, confederated and agreed to commit an offense against the United States and its agency, the Health Care Financing Administration, namely, to knowingly,  willfully, and intentionally offer and pay remuneration, directly and indirectly, overtly and covertly, in cash and in kind, to wit: by rebates and special pricing on dialysis related products, by lavish entertainment and hunting trips, by consultant fees, by grants, and by writing off debt for laboratory services for indigent and HMO patients, all such remuneration being made to  induce the external facilities to order and arrange for the ordering from LifeChem of any service and item paid for, in whole or in part, by the Medicare Program, specifically clinical laboratory blood testing conducted for dialysis patients in the external facilities, all in violation of Section Title 42, United States Code, Section 1320a-7b(b)(2)(B).

### OBJECTIVE OF THE CONSPIRACY

28.    The objective of the conspiracy was to induce external clinics to order, and to arrange for ordering, from LifeChem laboratory blood testing  services, including Non-Routine Tests for dialysis patients, which services were paid for primarily by Medicare Trust Funds.

21

## MANNER AND MEANS OF THE CONSPIRACY

29.    It was a part of the manner and means by which the conspiracy was accomplished that

the defendant **K. GLENN SHAW** together with others known and unknown to the Grand Jury,

offered and paid remuneration to certain external facilities in the form of rebates and special pricing

on dialysis related products, consultant fees, grants, lavish entertainment and hunting trips, and write-

off of bad debt for blood laboratory tests for indigent and HMO patients for the purpose of inducing

the referral of orders for laboratory services to LifeChem including Non-Routine Tests which services

were paid for primarily by the Medicare Trust Funds.

## OVERT ACTS

30.    In furtherance of the conspiracy, the defendant **K. GLENN SHAW**, together with

others known and unknown to the Grand Jury committed, among other acts, the following overt acts,

in the District of Massachusetts and elsewhere:

a.    From in or about May, 1987, the defendant **K. GLENN SHAW**, the Vice

President of Sales, and the Vice President of Finance for MPD directed that profit and loss analyses

be performed on external dialysis facilities to determine the level of product rebate or discounted

pricing or grant that could be offered to the facility by MPD by projecting profit from both MPD's

product business and LifeChem's laboratory business, all with the purpose of offering rebates, grants

and special pricing to the facilities in exchange for the referrals to LifeChem of laboratory services

including Non Routine Tests;

b.    In or about June 1987, MPD's Vice President of Finance, and others, directed

employees of MPD to discontinue the practice of expressly stating in MPD contracts with the external

dialysis facilities that pricing or rebates on MPD's dialysis related products was contingent upon

22

receipt by LifeChem of referrals from the facilities of laboratory blood testing services, while at the same time instructing the very same MPD employees to continue their practice of providing rebates or special pricing on MPD products in exchange for receiving referrals from the dialysis facilities to LifeChem of the laboratory blood testing business from those facilities;

       c.     In or about 1989, the Vice President of Sales and the Regional Sales Manager for the Southeast region at MPD, together with others, further concealed the practice of offering rebates or special pricing on MPD products to facilities in exchange for referrals from those facilities of laboratory testing business to LifeChem by specifically instructing employees of MPD to discontinue the practice of providing two separate contracts during negotiations with the facilities where one contract provided more favorable pricing and rebates on MPD products for the facility only if the facility, in return, referred the laboratory blood testing business to LifeChem, while at the same time continuing to direct and approve the ongoing practice by MPD employees of providing favorable pricing and rebates on MPD products to the external facilities in exchange for referrals from facilities of laboratory business to LifeChem;

       d.     From in or about 1990, MPD's Vice President of Sales and Regional Sales Manager for the Southeast region, together with others, further concealed the practice of offering rebates or special pricing on MPD products to the dialysis facilities in exchange for referrals from the facilities to LifeChem of laboratory business by cautioning the MPD sales force not to publicly acknowledge the practice of offering rebates and discounted prices to the facilities in exchange for referrals of laboratory business to LifeChem;

       e.     In the early 1990's, the defendant **K. GLENN SHAW**, the Vice President of Sales, and the Regional Sales Manager for the Southeast region at MPD approved the payment by

MPD for lavish holiday entertainment parties, including yacht rental worth thousands of dollars, for external dialysis facility G, in exchange for referrals to LifeChem of facility G's laboratory business;

f.   In or about 1992, the defendant **K. GLENN SHAW**, the Vice President of Sales, and the Regional Sales Manager for the Southeast region of MPD, approved payment by MPD for a bear hunting trip to Canada for a manager/administrator of various external dialysis facilities in exchange for referrals to LifeChem for all or some of the laboratory business from those facilities;

g.   In addition, on or about the dates set forth below, the defendant, **K. GLENN SHAW,** together with others known and unknown to the Grand Jury, committed, among other acts, the following overt acts as set forth below, which constituted payment of remuneration, including kickbacks and rebates, made to induce the external dialysis facilities to order and arrange for the ordering from LifeChem of laboratory blood tests:

| EXTERNAL DIALYSIS FACILITY | DATE PAID | AMOUNT PAID | FORM PAID |
|---|---|---|---|
| Facility A | 2/19/93 | $540.40 | Credit |
| Facility A | 5/26/93 | $426.12 | Credit |
| Facility A | 8/31/93 | $36.00 | Credit |
| Facility A | 9/3/93 | $1,077.05 | Credit |
| Facility A | 11/18/93 | $543.80 | Credit |
| Facility A | 3/8/94 | $583.16 | Credit |
| Facility A | 5/25/94 | $617.56 | Credit |
| Facility A | 9/12/94 | $695.36 | Credit |
| Facility A | 2/10/95 | $472.88 | Credit |
| Facility B | 11/18/91 | $7,500.00 | Credit |
| Facility B | 10/26/92 | $6,500.00 | Credit |

| | | | |
|---|---|---|---|
| Facility D | 10/22/91 | $37,784.00 | Credit |
| Facility D | 11/21/91 | $27,449.00 | Credit |
| Facility D | 5/18/92 | $34,071.53 | Credit |
| Facility D | 9/3/92 | $52,968.20 | Credit |
| Facility D | 6/8/93 | $101,602.00 | Credit |
| Facility D | 7/15/93 | $36,559.49 | Credit |
| Facility D | 9/7/93 | $21,562.00 | Credit |
| Facility D | 11/17/93 | $16,282.50 | Credit |
| Facility D | 3/8/94 | $19,614.10 | Credit |
| Facility D | 5/25/94 | $10,288.89 | Credit |
| Facility D | 9/6/94 | $6,815.00 | Credit |
| Facility D | 9/6/94 | $4,844.70 | Credit |
| Facility D | 2/8/95 | $5,645.31 | Credit |
| Facility D | 2/9/95 | $7,499.80 | Credit |
| Facility D | 3/28/95 | $6,213.76 | Credit |
| Facility D | 7/14/95 | $7,672.40 | Credit |
| Facility D | 10/24/95 | $8,977.47 | Credit |
| Facility E | 7/16/91 | $40,110.00 | Credit |
| Facility E | 11/12/91 | $61,881.00 | Credit |
| Facility E | 4/28/92 | $65,926.58 | Credit |
| Facility E | 7/22/92 | $69,592.92 | Credit |
| Facility E | 10/21/92 | $82,601.76 | Credit |
| Facility F | 5/24/88 | $4,500.00 | Grant |
| Facility F | 11/18/88 | $3,058 | Check |
| Facility F | 5/22/89 | $6,000.00 | Grant |
| Facility F | 6/11/90 | $4,500.00 | Grant |

| | | | |
|---|---|---|---|
| Facility F | 9/20/91 | $15,000.00 | Check |
| Facility F | 3/13/92 | $10,000.00 | Credit |
| Facility F | 10/23/92 | $4,675.00 | Credit |
| Facility F | 1/22/93 | $4,675.00 | Credit |
| Facility F | 4/12/93 | $5,579.80 | Credit |
| Facility F | 7/16/93 | $5,579.00 | Credit |
| Facility F | 10/14/93 | $5,422.60 | Credit |
| Facility F | 1/12/94 | $5,690.20 | Credit |
| Facility F | 5/26/94 | $4,675.00 | Credit |
| Facility G | 8/5/91 | $12,500 | Consultant Fee |
| Facility G | 6/27/90 | $9,153.00 | Credit |
| Facility G | 11/21/91 | $4,212.00 | Credit |
| Facility G | 2/13/92 | $21,645.00 | Credit |
| Facility G | 4/21/92 | $17,610.90 | Credit |
| Facility G | 7/16/92 | $8,413.00 | Credit |
| Facility G | 7/28/92 | $18,016.22 | Credit |
| Facility G | 10/26/92 | $21,223.60 | Credit |
| Facility G | 1/22/93 | $11,469.06 | Credit |
| Facility G | 1/22/93 | $20,397.00 | Credit |
| Facility G | 7/26/93 | $42,613.06 | Credit |
| Facility G | 10/20/93 | $35,239.10 | Credit |
| Facility G | 1/6/94 | $4,733.40 | Credit |
| Facility G | 1/20/94 | $21,169.00 | Credit |
| Facility G | 1/17/94 | $5,411.28 | Credit |
| Facility G | 4/10/94 | $24,011.00 | Credit |

All in violation of Title 42 United States Code, Section 1320a-7b(b)(2)(B) and all in violation of Title 18, United States Code, Section 371.

A TRUE BILL

_Sandra Aronsen_
FOREPERSON OF THE GRAND JURY


_Susan Winkler_
Assistant United States Attorney



DISTRICT OF MASSACHUSETTS                    December 6, 2000
                                             at 4:01 p.m.

Returned into the District Court by the Grand Jurors and filed.

_Jean Curtelle_
Deputy Clerk